**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**



UNITED STATES OF AMERICA and
COMMONWEALTH OF VIRGINIA,
            Plaintiffs,

v.                                                    Civil No. 2:09-cv-481

HAMPTON ROADS SANITATION
DEPARTMENT,
            Defendant.

## OPINION AND ORDER

*"It's raining, it's pouring. . . ."*

This phrase, the start of an old nursery rhyme describing a rainstorm and the consequences of unfortunate injury, is an appropriate introduction to this work. The questions that the Court is called upon to determine concern the proper consequences for certain environmental injuries, including the unintended discharge of sewage following heavy rainfall in March 2010, across the southeast region of the Commonwealth of Virginia.

Before this Court is a Motion for Judicial Review of Dispute Under Consent Decree from Defendant Hampton Roads Sanitation Department ("HRSD" or "Defendant"). Doc. 21. After conducting this review and carefully considering the pleadings and oral argument, a demand for stipulated penalties against Defendant is granted.

## I. BACKGROUND

Defendant petitioned this Court to review the possible assessment of penalties arising under an Amended Consent Decree ("Consent Decree"). The Consent Decree was entered via Court Order to remedy violations of the Clean Water Act ("CWA") and the State Water Control Law

1

("SWCL") allegedly caused by Defendant's operation of its complex sanitary sewer conveyance system and wastewater treatment plants. Pursuant to the Consent Decree's remediation terms, stipulated penalties can be assessed against Defendant when sanitary sewer discharges ("SSDs") occur.

In this case, the Plaintiffs United States of America, represented by the Environmental Protection Agency ("EPA"), and the Commonwealth of Virginia, represented by the Department of Environmental Quality ("DEQ") (referred collectively as "Plaintiffs"), contend that HRSD has illegally discharged pollutants into the waters of Virginia and the United States, and that these discharges were in violation of the Decree, and in violation of the federal and state water laws.

## II. PROCEDURAL HISTORY

Plaintiffs filed a lawsuit against HRSD on September 29, 2009, asserting that HRSD violated Section 301 of the federal Clean Water Act, 33 U.S.C. §1311(a), and Section 62.1-44.5 of the State Water Control Law, Va. Code §§ 62.1-44.2, *et. seq.* (1950). Plaintiffs sought immediate and long-term injunctive relief measures.

On February 23, 2010, Senior District Court Judge Jerome B. Friedman entered an Amended Consent Decree to resolve the dispute. *See* Doc. 19.

On September 30, 2010, the EPA issued a letter on behalf of the Plaintiffs demanding payment of penalties for thirteen SSDs that occurred between February 23, 2010 and June 30, 2010. Pls. Mem. Opp. re Mot. for Jud. Review ("Pls. Mem. Opp.") 8-9, Doc. 22. This triggered the Consent Decree's informal dispute resolution process. Three SSDs were resolved.

On June 20, 2011, Defendant filed the pending Motion for Judicial Review. Doc. 21. Defendant requested that this Court deny Plaintiffs' demand for stipulated penalties for the remaining ten SSDs at issue. The parties subsequently agreed to extensions in the briefing

schedule, and the action was reassigned to the undersigned. Oral argument was presented to the Court on February 8, 2012.

### III. STATEMENT OF FACTS

Hampton Roads Sanitation Department is a political subdivision of the Commonwealth of Virginia that owns and operates a sanitary sewer conveyance system and thirteen wastewater treatment plants. Consent Decree para. 1. This system is a part of an interconnected regional sewer system in southeastern Virginia. The system collects and treats wastewater from the cities of Chesapeake, Norfolk, Hampton, Newport News, Poquoson, Portsmouth, Suffolk, Virginia Beach, and Williamsburg, the counties of Gloucester, Isle of Wright, James City, and York, and the town of Smithfield (hereinafter referred to as the "Localities").

In a sanitary sewer system, sewage and wastewater are transported by one set of pipes and storm water is transported in a different set of pipes. Ex. 1 to Pls. Mem. Opp., Attach. C, Aff. of Mark Klingenstein ("Klingenstein Aff.") para. 7, Doc. 28-2. The design is intended to separate sewage from storm water regardless of weather conditions. *Id.* Sanitary sewer discharges can occur when the system experiences a capacity limitation. *Id.* at para. 8. These occurrences are defined as "any discharge to waters of Virginia, or the United States from the HRSD [separate sewer] system through a point source not authorized in any Permit." Consent Decree para. 13. A discharge consists of untreated wastewater containing sewage, industrial waters, oil, pesticides, herbicides, and other pollutants. These contaminants are required to be treated before discharge. The CWA and permits issued pursuant to the National Pollutant Discharge Elimination System ("NPDES") prohibit discharges from the collection system.

Capacity-related SSDs generally occur during wet weather, when rainwater or groundwater enters the separate sewer system. Klingenstein Aff. para. 8. An increasing flow that exceeds the

capacity of the separate sewer system causes sewage and wastewater to be discharged at unintended points, including manholes and basement drains. *Id.*

Equipment-related SSDs occur when a structural or mechanical failure occurs in the separate sewer system and results in a discharge. *Id.* at para. 9.

There is no dispute that HRSD's system has adequate dry weather sewage capacity. Ex. 6 to Def. Mem. in Supp. of Mot. for Jud. Review ("Def. Mem."), Aff. of Richard Stahr ("Stahr Aff.")paras. 4-5, Doc. 22-6. However, the sewage capacity of HRSD's system during severely wet weather is disputed. *Id.* at para. 5. Because of the system's alleged inadequacy, Plaintiffs commenced a coordinated effort to address SSDs in the southeastern Virginia in 2006. As a result of this effort, the Localities entered into a Special Order of Consent in state court, requiring the Localities to design and implement system improvements. The Special Order also required the Localities to participate in the Regional Wet Weather Management Plan ("RWWMP"), a regional plan designed to attain capacity that is sufficient to maintain weather-related separate sewer overflows and discharges. Consent Decree para. 8.

Plaintiffs and HRSD subsequently entered into the Consent Decree, resolving claims alleging over 350 violations of HRSD's NPDES permits, as well as numerous violations of the CWA and the SWCL for unpermitted sanitary sewer overflows from the HRSD sewer system and sewage treatment plants.[1] The Consent Decree required HRSD to implement programs to provide immediate and long-term improvements in its separate sewer system. *Id.* at paras. 8-10. The Consent Decree imposes penalties if HRSD fails to comply with the Consent Decree. Consent Decree para. 110.

---

[1]   HRSD is liable only for the separate system because it is the only portion of the sewer system in the Hampton Roads region over which HRSD exercises complete control. The other systems are intertwined with other local water agencies.

4

As noted above, on September 30, 2011, Plaintiffs demanded penalties for thirteen SSDs occurring between February 23, 2010 and June 30, 2010. The parties then entered into the informal dispute resolution process triggered by the Consent Decree and resolved three of the thirteen claims.

Of the remaining ten SSDs, six occurred on March 29, 2010, when a rainstorm soaked the Hampton Roads region. This storm brought 2.6 to 3.7 inches of rain in the region over a twenty-four hour period. Ex. 6 to Def. Mem., Letter from Counsel F. Paul Calamita to Judy Hykel on March 25, 2011 ("Calamita Letter"), Doc. 22-6.

As a result of the storm, six capacity-related overflows occurred, releasing over 146,000 gallons of wastewater in violation of federal and state water laws. Calamita Letter, Attach. Aff. of Phillip Hubbard ("Hubbard Aff.") para. 14.

The remaining four SSDs at issue in this litigation were caused by equipment failures. The first equipment-related SSD occurred on March 8, 2010 at the Independence Boulevard Pumping Station when an electrical component caused a pump to fail, triggering an illegal discharge. *Id.* at para. 15.

A second equipment-related discharge occurred on March 25, 2010 at 3824 Virginia Beach Boulevard. *Id.* at para. 16. This discharge was caused by the deterioration of a buried riser pump on the air release vent. *Id.*

Another equipment-related discharge occurred at the Suffolk Pump Station on March 29, 2010, when a standby pump developed a small hole in its discharge fitting. *Id.* at para. 17.

The final discharge at issue occurred on April 11, 2010 at the "Shell Road Force Main," when internal corrosion created a three-to-four inch hole in the top of a twenty-four inch ductile iron force main pipe. *Id.* at para. 18.

## IV. JURISDICTION

This court has jurisdiction to hear this matter pursuant to Section XXVII of the Consent Decree, which states that this Court "shall retain jurisdiction over this case until the termination of the Consent Decree, for the purpose of resolving disputes arising under this Decree." Consent Decree para. 165.

The Consent Decree requires the parties to first enter into an informal dispute resolution process before bringing their dispute to federal court. *Id.* The parties engaged in the process, and three claims for stipulated penalties were resolved. Ten claims remain for this Court to address.

## V. LEGAL STANDARD

A consent decree is a judicial act. It is not a contract, although some principles governing consent decrees overlap with the laws of contracts. *Gibson v. Allen*, Civil Action No. 2:78-2375, 2011 WL 2214919, at *6 (S.D. W. Va. June 3, 2011).

Consent decrees are interpreted as contracts. *Johnson v. Robinson*, 987 F.2d 1043, 1046 (4th Cir. 1993) (citations omitted). "[T]he scope of a consent decree must be discerned within the four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Willie M. v. Hunt*, 657 F.2d 55, 60 (4th Cir. 1981). "The circumstances surrounding the formation of the consent order or any technical or specialized meaning understood by the parties for words in the order may properly inform a court while it yet adheres to the 'four corners rule.'" *Id.* at 60 (quoting *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238, (1975)). "When interpreting a consent decree, words must be read in context, each of its provisions being interpreted together with its other provisions. Absent ambiguity in terms of the consent judgment, the intent of the parties must be ascertained solely from the instrument itself and

extrinsic evidence will not be admitted." *Gibson*, 2011 WL 2214919, at \*6 (internal quotation and citation omitted). "A court's ability to modify a consent decree or other injunction springs from the court's inherent equitable power over its own judgments." *Thompson v. U.S. Dep't. of Hous. & Urban Dev.*, 404 F.3d 821, 830 (4th Cir. 2005) (citations omitted).

The Consent Decree governs terms for payment of stipulated penalties. Consent Decree para. 136.

## VI. ANALYSIS

The primary question presented is whether HRSD is required to pay stipulated penalties as a result of the ten sanitation sewage discharges occurring between February 23, 2010 and June 30, 2010. In addressing this, the Court must turn to the *force majeure* provision of the Consent Decree to determine if it is applicable to SSDs. The role of the *force majeure* provision in this litigation is complex and dispositive. First, the Court must resolve whether the provision can be invoked to excuse Defendant from paying stipulated penalties for the six weather-related SSDs and the four equipment-related SSDs.

Next, after concluding that the *force majeure* provision can be invoked, the Court must determine the proper standards for evaluating the provision's applicability to each SSD at issue.

Finally, the Court must resolve whether the Defendant is liable for stipulated penalties for each SSD in light of these standards.

### A. Can Defendant invoke the *force majeure* provision of the Consent Decree to possibly preclude liability for Stipulated Penalties for Sanitation Sewage Overflows or Sanitation Sewage Discharges?

The *force majeure* provision in the Consent Decree provides:

> 'Force Majeure' for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of HRSD . . . that delays or prevents the performance of any obligation under this Consent Decree despite HRSD's . . . best efforts to fulfill the obligation.

Consent Decree para. 130.

Plaintiffs contend that the *force majeure* provision of the Consent Decree cannot be invoked by HRSD to avoid liability for stipulated penalties for SSDs.[2]  Plaintiffs argue that the *force majeure* provision should be interpreted as applying only to "construction schedules, and milestones and similar requirements for injunctive relief in the consent decree." Pls. Mem. Opp. at 13.  Plaintiffs also contend that applying the *force majeure* clause to the stipulated penalties is contrary to United States and Virginia law.

After careful consideration, the Court concludes that the *force majeure* provision may be invoked to possibly preclude liability for stipulated penalties for SSDs.  Plaintiffs' construction of the *force majeure* provision is unsupported by the language of the Consent Decree.  The *force majeure* provision has no limiting language relating to SSDs, and its invocation here does not circumvent federal and state laws.  Plaintiffs will be able to assert future actions against HRSD regardless of the Court's decision on this matter.  The possibility of claims remains as an incentive for HRSD to comply with the Consent Decree to avoid Stipulated Penalties and enforcement actions.  Further, this interpretation of the *force majeure* provision, as it applies to

---

[2]  Defendant argues that Plaintiffs' position during the informal proceeding was different, and that Plaintiffs' current interpretation of the *force majeure* provision is an attempt to revise the Consent Decree.  HRSD argues that during the informal dispute resolution proceedings, Plaintiffs agreed that the *force majeure* provision applied.  Even if Plaintiffs failed to raise this argument during the informal dispute process, they are not precluded from doing so now.  Rule 408 of the Federal Rules of Evidence provides that "evidence . . . when offered . . . to impeach through a prior inconsistent or contradiction [is inadmissible if] . . . (2) [the] conduct or statement [was] made in *compromise negotiations* regarding the claim." Fed. R. Evid. 408 (emphasis added).  Compelling Plaintiffs to adhere to commentary shared during the informal dispute resolution is barred by Rule 408(2) and would weaken the Consent Decree's informal dispute resolution process.  Limiting the parties to positions they considered during the informal dispute resolution process could chill the frank exchange of information.  Fed. R. Evid. 408 Advisory Committee's Notes at 307.

SSDs, is consistent with other provisions of the Consent Decree. *See* Consent Decree at para. 108 (describing a violation of the Consent Decree); para. 110 (delineating scenarios regarding stipulated penalties); para. 129 (describing the accounting of the stipulated penalties when a violation of the Consent Decree is also a violation of federal and state law); and para. 154 (describing Plaintiffs' right to file additional claims against HRSD).

Plaintiffs begin their challenge to Defendant's proposed invocation of the *force majeure* provision to SSDs by offering an interpretation of the provision's phrase "*that delays or prevents the performance of any obligation under this Consent Decree.*" *Id.* at para. 133. Plaintiffs suggest that this phrase indicates that the *force majeure* provision should be limited to the Consent Decree's compliance program, injunctive relief deadlines, and procedures that are set forth in Sections V-XVIII of the Consent Decree. Plaintiffs argue that the emphasized language forecloses the application of the *force majeure* provision to SSDs.

Plaintiffs' argument is unpersuasive. "When interpreting a consent decree, words must be read in context, each of its provisions being interpreted together with its other provisions." 46 Am. Jur. 2d Judgments § 195 (2012). The Consent Decree states that "HRSD shall be liable for stipulated penalties to the United States and State for violations of the Consent Decree as *specified below*, unless excused under . . . Section XXI (Force Majeure)." *Id.* at para. 108 (emphasis added). A violation of the Consent Decree is defined as "including failing to perform satisfactorily any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree and within the specified time schedules established by or approved under the Decree." *Id.*

The obligations "required by the terms of this Decree" are not limited to work plans of the Consent Decree. Instead, the parties defined the types of violations subject to the stipulated

penalties provision, and included SSDs. *See* Consent Decree paras. 108-29. The penalties provision for SSDs, and other unauthorized discharges, states that HRSD will be subject to a stipulated penalty for each SSD, "Prohibited Bypass or unauthorized discharge from the HRSD SS System or the HRSD STP that occur after the date of entry of the Consent Decree." Consent Decree para. 110. There is no indication that the *force majeure* provision cannot be invoked for SSDs. The only language that limits the applicability of the *force majeure* provision is found in paragraph 130, which states that "[f]orce [m]ajeure does not include HRSD's financial inability to perform an obligation under the Consent Decree."

Plaintiffs next assert that the *force majeure* provision cannot be invoked for SSDs because the provision "is inconsistent with the general scheme of liability in the federal and state water laws." Pls. Mem. at 15. Specifically, Plaintiffs contend that applying the *force majeure* provision to SSDs would allow HRSD to circumvent the law, because the Clean Water Act and Virginia State Water Control laws should be construed as strict liability regimes. *See American Canoe Ass'n. v. Murphy Farms, Inc.*, 412 F.3d 536, 540 (4th Cir. 2005); *see also Stoddard v. W. Carolina Reg'l Sewer Auth.*, 784 F.2d 1200, 1208 (4th Cir. 1986) (citations omitted).

In the cases relied upon by Plaintiffs, the courts addressed limiting the statutory enforcement power of the EPA, and the decisions support Plaintiffs' assertion that the CWA is a strict liability regime. However, Plaintiffs are unpersuasive in their contentions that invoking the *force majeure* provision with respect to possible liability for SSDs would be inconsistent with the CWA's strict liability regime. The liability scheme remains valid. Enforcement actions under federal and state law are not precluded regardless of whether the *force majeure* is applied to the SSDs. *See* Consent Decree paras. 152-59.

Accordingly, the Court concludes that the provision the *force majeure* provision can be invoked under circumstances presented here. The Court must next determine the standards for evaluating whether the provision is applicable to any of the SSDs at issue.

**B.  What are the standards for determining the possible applicability of the *force majeure* provision to the Sanitary Sewer Discharges at issue?**

As already provided, the Consent Decree defines a *force majeure* occurrence "as any event arising from causes beyond the control of HRSD, of any entity controlled by HRSD, or HRSD's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite HRSD's . . . best efforts to fulfill." *Id.* at para. 130. The Consent Decree also states that "HRSD's financial inability to perform any obligations under this Consent Decree" does not constitute a *force majeure* event. *Id.*

The Court has considered the parties' arguments regarding the applicable standards here. The primary dispute regarding the standard for evaluating the *force majeure* provision is foreseeability.

Defendant contends that "foreseeability" should not be a part of the Court's calculus when determining the meaning of the *force majeure* provision. Defendant argues that foreseeability was "not bargained for language" in the Consent Decree, and relies on two decisions to support its proposition that "foreseeability" should be inapplicable. Def. Mem. at 13-14 (citing *Perlman v. Pioneer Ltd. P'ship*, 918 F.2d 1244, 1248 (5th Cir. 1991), *Vinegar Hill Zinc Co. v. United States*, 276 F.2d 13, 15-16 (Cl. Ct. 1960)) (other citations omitted).

In *Perlman*, the Fifth Circuit concluded that the district court's adoption of a general *force majeure* doctrine that included foreseeability was erroneous because "foreseeability" was absent from the parties' contract. *Perlman*, 918 F.2d at 1248. The appellate court stated that the *force majeure* doctrine is "not a fixed rule of law that regulates the content of all *force majeure* clauses

11

but instead is a term that describes a particular type of event, *i.e.*, an 'Act of God' which may excuse performance under the contract." *Id.*

In *Vinegar Hill*, the United States Court of Claims held that the "so entitled *Force Majeure* article of the contract was very broad," but did not include unforeseen conditions of an unusual nature. 276 F.2d at 15-16.

The decisions in *Perlman* and *Vinegar Hill* demonstrate that language contained in a consent decree is critical when interpreting a *force majeure* provision. In this case, two operative phrases in the *force majeure* provision are dispositive: "any event arising beyond the control of HRSD" and "despite HRSD's . . . best efforts to fulfill the obligation." Consent Decree para. 130.

The "despite HRSD's best efforts" phrase includes foreseeability. The provision provides that the requirement that HRSD exercise best efforts to fulfill the obligation *includes using best efforts to anticipate any potential force majeure event* and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay "to the greatest extent possible." *Id.* The provision uses the term "anticipate," and this speaks to foreseeability. "Anticipate" is defined as "to take up or deal with (a thing), or perform (an action), before another person or agent has had time to act, so as to gain an advantage; to deal with beforehand, forestall (an action)." Oxford English Dictionary (2d. 1983; online version March 2012), *available at http://www.oed.com/view/Entry/8552.*

Therefore, this Court concludes foreseeability is bargained-for-language of the *force majeure* provision, and must be a part of the court's analysis in determining whether the *force majeure* provision precludes liability for stipulated penalties for SSDs. With this in mind, and after considering the parties' arguments and applicable case law, this Court concludes that before the *force majeure* provision can be applied to preclude liability, HRSD must show by a

12

preponderance of the evidence that the discharge at issue was caused by an event beyond its control.

### C. Can Defendant establish by a preponderance of the evidence that any of the six weather-related sanitation sewer discharges on March 29, 2010 were *force majeure* events?

For stipulated penalties to be excused for the six wet weather-related SSDs, HRSD must show by the preponderance of the evidence that the SSDs related to the storm on March 29, 2010 were caused by an event beyond Defendant's control despite using its best efforts. The Court concludes that "best efforts" here requires HRSD to demonstrate that it anticipated a weather event such as the one occurring on March 29, 2010, and addressed the event during and after the occurrence to mitigate the discharge.

The Court also concludes that HRSD has failed to demonstrate by the preponderance of evidence that the six storm-related SSDs were caused by an event beyond its control. This conclusion turns on the evaluation of expert opinion testimony presented by the parties.

Primarily, HRSD asserts that it could not prepare for and prevent SSDs when the March 29, 2010 storm occurred because the storm created more water flow than its system could handle. HRSD alleges that the March 29 storm-related SSDs were a result of an unforeseeable combination of tidal conditions, groundwater levels, wastewater, and heavy rainfall. Richard Stahr ("Stahr"), Senior Vice President in the engineering firm of Brown and Caldwell, testified on behalf of Defendant and acknowledged that HRSD has the capacity to manage wastewater during dry weather conditions, but not during wet weather conditions. Stahr Aff. paras. 4-5. Stahr averred that the March 29, 2010 storm created a high peak flow beyond the "finite capacity" of HRSD's current infrastructure. *Id.* at paras. 14-16. Stahr also asserted that "[u]ntil

the RWWMP is developed and a level of service is approved, any interim solutions are speculative and risky expenditures." *Id.* at para. 10.

Relatedly, HRSD claims that it cannot make unilateral improvements to its infrastructure to address SSDs caused by excessive water flow because of its interdependency with the Localities' sanitary sewer and interceptor systems. Ex. 7 to Def. Mem., Attach. Aff. of Maria Nold, Acting Regional Director of DEQ, at para. 10, Doc. 22-7.

Defendant's argument that the weather-related SSDs were caused by a wet-weather event beyond its control is unpersuasive in light of the record before the Court. Mark Zolandez, EPA Environmental Scientist ("Zolandez"), opined on behalf of Plaintiffs that the storm event experienced in southeastern Virginia on March 29, 2010 was not unusual. Zolandez described the storm on March 29, 2010 as an event comparable to an annual to bi-annual storm throughout the region. Ex. 1 to Pl. Mem. Opp., Attach. A Decl. of Mark Zolandez, para. 24 ("Zolandez Decl."). This fact is not challenged by HRSD. The Court finds that the March 29, 2010 storm was not of the magnitude and frequency that meets the definition of an "event beyond HRSD's control."

Defendant was responsible for implementing a plan to limit SSDs when its service area experiences an annual to bi-annual storm that will bring more water flow than its known limited system capacity.[3]

This is especially true given the known history of storm-related discharges at each of the locations of the six disputed SSDs. Klingenstein Aff. para. 19F. Mark Klingenstein, a

---

[3] Plaintiffs cite to several cases considering a claim of *force majeure* in the commercial context, where the courts held that a two-year storm was not unusual, extraordinary or unprecedented. These cases interpret New York state law. *See e.g., Longview Fibre Co. v. CSX Transp., Inc.*, 526 F. Supp. 2d 332, 338 (N.D.N.Y. 2007)(other citations omitted). The Court declines to apply these cases to this matter.

professional engineer retained by the Department of Justice, states that the tidal conditions, groundwater level and Localities' wastewater were not atypical on March 29, 2010. *Id.* at para. 4. This fact undercuts HRSD's argument that weather-related SSDs were not preventable because of the confluence of storm and tidal conditions.

Stahr's opinion that "any interim solutions are speculative and risky expenditure" is unpersuasive. *See* Stahr Aff. paras. 9-10. The Court has considered the fact that HRSD has "acknowledged several early action projects identified in the Consent Decree [that] would ameliorate the six [capacity–related] overflows." Ex. 7 to Def. Mem., HRSD Statement of Position on March 25, 2011, Doc. 22-7.[4] This evidence suggest that possible interim solutions are less speculative and risky than stated by the expert retained by HRSD for this litigation.

Defendant's contention that the tidal conditions made this storm unforeseeably worse is not supported by the record. In light of the weight of persuasive expert testimony compelling the conclusion that the storm on March 29, 2010 was comparable to an annual to bi-annual storm in the region, and that the circumstances that contributed to the SSDs were insufficiently extraordinary to trigger the *force majeure* provision, HRSD has failed to establish that the provision applies to the six weather-related SSDs.

As noted, the Consent Decree requires HRSD to anticipate these kinds of events and to use its best efforts to address the effects of each event (a) as it is occurring and (b) after it has occurred to prevent or minimize any delay to the greatest extent possible. Consent Decree para. 130. The Court concludes HRSD has failed to do so. For these reasons, the *force majeure*

---

[4] Subsequent remedial measures may be admit into evidence when offered "for another purpose such as impeachment, or—if disputed—proving ownership, control, or feasibility of precautionary measures." Fed. R. Evid. 407.

provision is inapplicable and does not preclude HRSD's liability for stipulated penalties arising from the six weather-related SSDs.

**D. Does invocation of the *force majeure* provision also fail to preclude liability for penalties for the equipment-related sanitation sewer discharges?**

Next, the Court must determine whether HRSD is liable for stipulated penalties for the four sanitation sewer discharges that were caused by equipment failures. HRSD argues that mechanical breakdowns may qualify as *force majeure* events because it had no control over the breakdowns.

Defendant relies upon the decision in *Phibro Energy, Inc. v. Empresa De Polimeros De Sines Sarl*, 720 F. Supp. 312, 319 (S.D.N.Y. 1989), for the proposition that equipment failures can constitute a *force majeure* events. The Court agrees with the decision in *Phibro Energy* to the extent that it recognizes the principle that language in the consent decree at issue is controlling. *Phibro Energy*, 720 F. Supp. at 319. In the case at bar, the Consent Decree defines a *force majeure* event as "any event arising beyond the control of HRSD[.]" Consent Decree para. 130. Equipment failures are not explicitly excluded. An equipment failure may be a *force majeure* event, therefore, if HRSD can prove that the failure at issue was beyond its control. The Court must examine the record to determine whether each equipment-related SSD was caused by an event beyond HRSD's control.

1. Discharge at Independence Boulevard

It is undisputed that on March 8, 2010, an SSD occurred at Independence Boulevard Pressure Reducing Station due to an electrical component malfunction (the "Independence SSD"). Hampton Roads Sanitation Department responded to the malfunction within thirty-eight minutes to mitigate the discharge. Phillip Hubbard, HRSD Special Assistant for Compliance Assurance and Professional Engineer, opined that despite proper maintenance, "an unexpected malfunction

16

of an electrical component caused the pumps inside the station to trip out," which resulted in the SSD. Hubbard Aff. para. 15.

Despite HRSD's response, 200 gallons of untreated sewer water flowed into a creek. *Id.* This discharge was not permitted under federal and state law. However, HRSD asserts that the Independence SSD is not subject to a stipulated penalty because it was caused by the electrical component malfunction, an event beyond its control. Hampton Roads Sanitation Department argues that it could not have anticipated the electrical malfunction or have responded in a manner as to prevent the discharge. Hubbard opined that the pump station was properly maintained and that HRSD performed preventative maintenance and proactively replaced the mechanical timer on the pumps with electric timers in 2009. *Id.*

The Court finds that HRSD has not shown by the preponderance of the evidence that the Independence SSD was beyond its control. Hubbard stated that the Independence SSD was started by an unexpected failure of an internal electrical component. However, HRSD knew or should have known that the equipment used at the Independence Pumping Station had outlived its usefulness. *See* Klingenstein Aff. para.15. Klingenstein opined that HRSD's operation of "equipment beyond its useful life . . . has increased the likelihood of mechanical and electrical failures and resultant sanitation sewer discharges." *Id.* Klingenstein's opinion was based on HRSD's published design standards that state electrical power equipment has a useful design life of twenty years and that the instrument and electrical control equipment has a useful design of ten years. *Id.*

The record shows that in 2006, HRSD took notice "that 41% of its pump stations were 'beyond the end of useful life' (*i.e.,* over 50 years old)." *Id.* Furthermore, Klingenstein referred to documentation drafted by HRSD that proposed making upgrades "to this pump station [that]

included the replac[ment] [of] the existing unreliable liquid rheostat controls with frequency drives and associated equipment (pumps, generators) motor drives to ensure reliability." *Id.* This suggests that HRSD knew about the potential risks inherent in maintaining a system beyond its useful and intended design life.

Defendant's argument that the equipment failure was beyond its control is based upon unsupported speculation.   It is in within HRSD's control to maintain and upgrade its infrastructure to ensure compliance with the federal and state laws.  Excusing HRSD for this equipment-related SSD despite its knowledge of its eroding system, and its apparent practice of "wait and see" maintenance protocol, would be violative of the letter and spirit of the parties' Consent Decree.

2.   Discharge at 3284 Virginia Beach Boulevard

On March 29, 2010, an SSD occurred at 3824 Virginia Beach Boulevard as a result of the deterioration of a buried riser pipe on an air release vent (the "Virginia Beach SSD").  Hubbard Aff. para.16.  Riser pipes vent corrosive gases to protect the force mains.  Previously, HRSD performed preventive maintenance on the air release vent in May 2009 and the valve worked properly.  Hubbard Aff. para.16.

Defendant contends that the Virginia Beach SSD was caused by an event beyond its control. In support, HRSD relies on Hubbard's expert opinion that the riser pipe was properly maintained and that no further maintenance was necessary.  *Id.* at para. 17.  Hampton Roads Sanitation Department also notes that the pipe's underground location made it difficult to inspect.[5]

---

[5] This contention is rejected.   Defendant's decision to bury its pipes should compel more effective and conscientious inspection rather than excuse its neglect.

Plaintiffs correctly refute HRSD's claim that the Virginia Beach SSD was caused by an event beyond Defendant's control.   Additional maintenance was warranted, especially because Defendant knew that the riser pipe was forty years old.

Klingenstein opined that more frequent maintenance and inspections should have been performed and that HRSD's "Interceptor System Preventive Maintenance Manual" directed that a manual vent (air riser), should be checked every six months. Klingenstein Aff. para. 17. There is no dispute that HRSD's last check of the vent was at least eight months before the SSD occurred.

Furthermore, Klingenstein noted that a simple material upgrade of the galvanized steel riser pipe (which was installed in 1967) to a newer corrosion-resistant material was warranted. *Id.*

For these reasons, the Court finds HRSD did not met its burden to demonstrate that the Virginia Beach SSD was caused by an event beyond its control. The Court also finds that HRSD did not use its best efforts to prevent the Virginia Beach SSD.

3.  Discharge at Suffolk Pump Station

On March 29, 2010, a discharge occurred after a small hole developed in the standby pump located at the Suffolk Pumping Station ("Suffolk SSD"). Hubbard Aff. para. 17. The Suffolk SSD was discovered during the March 29, 2010 storm when a standby pump became operational to augment the normal pumping.  *Id.*  This alerted HRSD to dispatch a crew to the Suffolk station.  The response team arrived to Suffolk Pumping Station and replaced the damaged discharge fitting.  *Id.*  HRSD recovered 200 of the 300 gallons of untreated water released because of the SSD. *Id.*

Defendant contends that equipment failure was caused by an unforeseeable event. Hampton Roads Sanitation Department relies on Hubbard's opinion that the small hole in the discharge

fitting of the standby pump was "an unforeseeable failure of the fitting." *Id.* Hubbard further opined that given the large number of fittings throughout the system, an "occasional failure that results in a small release from the system is simply unavoidable." *Id.*

This opinion is conclusory and his testimony is unpersuasive. The record establishes that the Suffolk SSD was a result of HRSD's failure to maintain its aging sewer system. Defendant provides insufficient reason for why the equipment failure could not be avoided.

The Court is instead persuaded that HRSD failed to perform the maintenance as directed by its own manuals, and failed to follow its own regulations regarding standby pumps. As Klingenstein noted, HRSD's Interceptor Systems Preventive Maintenance Manual directs that a technician should perform daily inspections and services on electrical portable pumps used at stations on a temporary or semi-permanent basis. Klingenstein Aff. para. 19M. There is insufficient evidence that HRSD followed this procedure.

For these reasons, the Court finds that the cause of the Suffolk SSD was within HRSD's control.

4. Discharge at Shell Road Force Main

On April 11, 2010, the force main pipe located at Shell Road failed and caused a sanitation discharge (the "Shell SSD"). It is undisputed that the Shell SSD was caused by a "three to four inch hole from internal corrosion in top of the twenty-four inch ductile iron force main pipe." Hubbard Aff. para. 18. Hampton Roads Sanitation Department stopped the leak temporarily by evacuating the pipe, and installed a full clamp to limit the damage of the Shell SSD. *Id.* Later, HRSD executed an emergency capital improvement project to create a permanent solution to the problem. *Id.*

Defendant contends that the Shell SSD was a result of an event beyond its control because it performed an inspection of the Shell Road main pipe "around 2003" and determined that it was in good condition. Ex. 6 to Def. Mem. (Calamita Letter). Defendant relies upon Hubbard's statement that "the failure of the [main pipe] could not have been anticipated or controlled." Hubbard Aff. para. 18.

Defendant's knowledge of its aging separate sewer system and its limited force main inspection program created the opportunity to prevent the Shell Road force main failure that resulted in the SSD. The implementation of the emergency plans in response to SSDs, regardless of the effectiveness of the response, fails to excuse the responsibility that exists for the SSD and the liability for stipulated penalties that are triggered by the SSD. This is especially true given that "HRSD relies on force mains to convey sewage to a much greater degree than most sewer systems. . . ." Klingenstein Aff. para. 21. The Court agrees with this expert's opinion that "HRSD should have developed an aggressive force main inspection program[.]" *Id.*

Significantly, the means existed for HRSD to prevent this SSD. The EPA expert opined that the force main failure was caused by extreme corrosion that could have been detected if HRSD used a hydrogen sulfide monitoring program. Zolandz Decl. para. 37. Zolandz testified that in December 2008 "[he] suggested that HRSD improve its force maintenance program by performing regular force main inspections on more of HRSD's force mains based upon, among other things, pipe age, pipe material, and pipe maintenance history." *Id.*

This evidence undercuts HRSD's claim that it was unaware of the likelihood of this equipment failure, and that the failure was not within its control. Instead, HRSD disregarded the EPA's recommendation that it should develop a more effective main pipe inspection program. Defendant cannot now evade its responsibility for penalties triggered by the Shell SSD.

## VII. Conclusion

The Court finds as a matter of law that the *force majeure* provision may apply to Stipulated Penalties for Sanitation Sewage Overflow or Discharges.  Under the terms of the Consent Decree, the *force majeure* provision may be invoked regarding these violations when considering Defendant's potential liability for stipulated penalties.

However, the Court also finds that the ten sanitation sewer discharges at issue were not caused by events beyond HRSD's control.  Therefore:

**IT IS HEREBY ORDERED** that Defendant's Motion for Judicial Review of Dispute under Consent Decree, Doc. 21, is **GRANTED IN PART** and **DENIED IN PART** as follows: Judicial review has been undertaken, and results in the conclusion that Plaintiff's demand for stipulated penalties for the ten sanitary sewer discharges at issue must be **GRANTED**.  The parties shall confer to ensure compliance with this Court's conclusion that HRSD shall pay stipulated penalties for these discharges in a manner consistent with the terms of the Consent Decree.

**IT IS REQUESTED** that the Clerk of the Court send a copy of this Order and Opinion to all counsel of record.

**IT IS SO ORDERED.**

April **2d**, 2012
Norfolk, Virginia

Arenda L. Wright Allen
United States District Judge